Filed 9/16/22  P. v. Valenzuela CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>PETE VALENZUELA, JR.,<br><br>    Defendant and Appellant. | F078859<br><br>(Super. Ct. No. CRM027488A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  Ronald W. Hansen, Judge.

Laura Schaefer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Barton Bowers, Darren K. Indermill, Amanda D. Cary, and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Pete Valenzuela, Jr. was convicted by a jury of three counts of first degree murder, one count of attempted first degree murder, and one count of assault with

a semiautomatic firearm and was sentenced to life in prison without the possibility of parole. He raises many issues on appeal. We reverse the jury's Penal Code[1] section 186.22, subdivision (b), enhancement findings, as well as its section 190.2, subdivision (a)(22) special circumstance findings. Valenzuela may be retried on these allegations. Whether or not the People elect to retry Valenzuela, Valenzuela is entitled to a resentencing.

## STATEMENT OF THE CASE

Valenzuela was charged in a first amended information with three counts of first degree murder (§ 187, subd. (a); count 1 [victim Luis Morales]; count 2 [victim Benjamin Mariano]; count 3 [victim Antonio Jacobo]); one count of attempted murder (§§ 187, subd. (a), 664; count 4 [victim Jonathan T.[2]]); and one count of assault with a semiautomatic firearm (§ 245, subd. (b); count 5 [victim Jonathan T.]). The information further alleged the following: as to counts 1 and 2, gang-murder special circumstances (§ 190.2, subd. (a)(22)) and that Valenzuela committed the offenses for the benefit of or in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)); as to counts 1, 2, and 3, multiple murder special circumstances (§ 190.2, subd. (a)(3), and that Valenzuela intentionally and personally discharged a firearm causing great bodily injury and death (§ 12022.53, subds. (d) & (e)); as to count 4, that Valenzuela personally discharged a firearm (§ 12022.53, subd. (c)); and, as to all counts, that Valenzuela had served a prior prison term (§ 667.5, subd. (b)). The amended information charged Patrick Cervantes similarly with regard to counts 1 and 2. Cervantes was also charged with the attempted murder of Jonathan T.

---

[1] Undesignated statutory references are to the Penal Code.

[2] To protect their privacy, we will refer to the surviving victim and certain other persons in this case using their full first names and last initials.

Trial began on October 25, 2018, and on December 7, 2018, the jury returned verdicts convicting Valenzuela as charged, except that as to count 4 the jury found not true the allegation that Valenzuela personally and intentionally discharged a firearm, instead finding true an allegation that he personally used a firearm (§ 12022.53, subd. (b)). In a bifurcated proceeding, Valenzuela admitted serving a prior prison term.

On January 24, 2019, the trial court sentenced Valenzuela to three consecutive terms of life without the possibility of parole plus 93 years to life, and imposed various fines, fees, and assessments, including a $200 court security fee (§ 1465.8), a $150 criminal conviction assessment (Gov. Code, § 70373), and a $10,000 restitution fine (§ 1202.4, subd. (b)).

## FACTS

### I. October 7, 2012 — Antonio Jacobo murder

On October 7, 2012,[3] William G. lived on the corner of 7th Street and T Street in Merced. Around 11:00 p.m. that night, he heard a gunshot. He went outside and heard four more shots about 30 to 35 seconds after the first shot. He saw what he described as a 2000 or 2001 white Dodge Dakota pickup truck with a camper shell parked just east of the corner of 6th Street and T Street. After the shots were fired, he saw the pickup drive east down 6th Street toward R Street, and then turn north onto R Street.

In his October 8 statement to police, William G. said he thought it was strange the pickup "did not drive out very fast," but drove at a normal speed after the shooting. But at trial, he testified the pickup was going "pretty good" after the shooting.

Officers responded to the scene shortly after the shooting. Jacobo, a homeless man, was found lying on the south side of 6th Street in front of a school, just east of T Street. He was lying half on the sidewalk and half on the street. He still had a pulse, but EMS personnel could not revive him.

---

[3] Subsequent references to dates are to dates in 2012 unless otherwise stated.

Jacobo's bicycle was across the street. A bag hanging from the handlebars contained marijuana and some of Jacobo's belongings. Jacobo also had marijuana on his person. A trail of blood and some small denomination currency bills and change led from the middle of 6th Street toward Jacobo's body. At least one of the bills and a nickel had blood on them. There was also a trail of five spent cartridge casings leading from the middle of the street to Jacobo. The casings trail similarly tracked the money trail. Some casings were near the middle of the street, and one of the casings was about two or three feet from Jacobo's body. The cartridge casings all had the same headstamp. The headstamp had the letters "WCC," the number "12," and an encircled cross. There were also two bullet fragments found at the scene, one near Jacobo's body.

Jacobo was shot several times. He had two gunshot wounds to his head, a third wound that started in his head and ended in his back, "several" wounds to one thigh, and two "graze" wounds. The forensic pathologist who performed the autopsy testified that the two wounds to the head were each fatal, and that the shots to the "lower torso … would probably have been survivable." The pathologist said the two headshots were from intermediate range, meaning from a few inches up to several feet away. One bullet was found in Jacobo's back during the autopsy.

Valenzuela's grandmother lived near the shooting scene at an S Street residence, between 6th Street and 4th Street, and his mother, Isabel G., and Isabel G.'s boyfriend, Jose S., lived with her at the time Jacobo was killed. Isabel G. was previously married to Jacobo for about two months. Jacobo was convicted in December 2008 of having made a criminal threat against Isabel G. in November 2008. Isabel G. stated she did not leave Jacobo because of the criminal threat, but because of his heroin addiction. When asked if Valenzuela was upset Jacobo had threatened her, Isabel G. said, "No. My son was not around during that time. My son was raised by my mother."

A Merced police detective went to Valenzuela's grandmother's house around October 13 and saw a white Dodge Ram pickup in the driveway with a camper shell on it.

4.

When the detective returned to the house on October 15, the camper shell had been removed.

Michael R., who lived in a small building behind the main house, owned the Dodge Ram pickup parked in front of the house. He testified the door to his residence did not lock completely, so anyone could get inside. He kept his pickup keys in his residence. He testified he was home asleep the night Jacobo was killed. However, he previously told a detective he believed he heard his truck start up that night.

Officers seized the pickup in October 2012. Before it was seized, Michael R. had washed the outside of the truck but had not cleaned the inside. The pickup was dirty, but it appeared the inside of the passenger window had been wiped. DNA from at least two contributors was found on the steering wheel and the driver's side door handle but was of too poor a quality to identify any of the contributors. Eighteen latent fingerprints were obtained from the pickup and run through the Automated Latent Print System with no results.

Isabel G. testified the pickup was nonoperational the entire time Michael R. lived on the property and never had a camper shell on it. But a police technician who processed the pickup for evidence when it was seized testified he started the pickup, put it in gear, and drove it approximately a foot forward and backward.

Officers executed a search warrant at the S Street residence on October 15. A detective knocked on the door, and a male and female asked who it was. The detective said it was the Merced Police Department with a search warrant. The detective heard a male voice say, "Hold on," and heard what sounded like people running inside the house. Officers forced entry and encountered Jose S. and Valenzuela's girlfriend, Irie C. Jose S. spoke only Spanish and his voice did not sound like the one that said, "Hold on." One of the house's back windows was open. Cervantes testified Valenzuela told him once that he and Irie C. were at the house that day when police arrived, and that he left out a side door and ran to a neighbor's house down the street.

5.

Officers found marijuana, digital scales, a cell phone with a picture of Valenzuela holding marijuana, a beanie cap with holes for eyes and mouth, identification cards for Valenzuela and Irie C., and men's clothing that Jose S. said did not belong to him. Valenzuela told police in a post-arrest interview on December 27 that he had been at the house earlier in the day when the warrant was executed but was not there when the officers arrived. Isabel G. testified Valenzuela did not live at the house at the time but would sometimes stay there a day or two.

Cervantes testified[4] that one time Valenzuela told him he had killed someone on the west side of town, around the corner from his grandmother's house. Valenzuela said there was a park near the area of the shooting. When asked if Valenzuela had provided any details, Cervantes testified, "He referred to whom he had shot and said he had shot him a handful of times." But Cervantes was never asked to name the person Valenzuela shot. Cervantes said Valenzuela told him, "[t]hat they had jumped out of the vehicle that he was in and walked up on the individual and proceeded to shoot him down." Cervantes was also never asked to clarify who Valenzuela was referring to with the pronoun "they." Valenzuela further told Cervantes he shot the victim a number of times, and when the victim fell, he shot him a couple more times. Valenzuela also mentioned a "white truck" when talking about the shooting. Cervantes testified that one time he rode in a white pickup with Valenzuela driving, and that the white pickup had been parked at Valenzuela's grandmother's house. Cervantes did not know whose truck it was.

---

[4] Cervantes was originally a codefendant in the present case, charged with the murders of Mariano and Morales and the attempted murder of Jonathan T., and pleaded guilty to the attempted murder of Jonathan T. As part of a deal, he received a lighter sentence of seven years and had murder charges dismissed in exchange for his truthful testimony. He had access to discovery, including the police reports, in the present case. According to his former girlfriend, Laura I., in 2012, Cervantes supported himself by selling drugs.

## II. October 28, 2012 — Shaffer Road incident

In October 2012, Sean B., Cervantes's friend, lived in a rural area on Shaffer Road. Cervantes introduced Sean B. to Valenzuela in October 2012. Valenzuela needed a place to stay, and Sean B. agreed Valenzuela could stay with him for a while and help him around the house.

On October 28, several people gathered at Sean B.'s residence, including Valenzuela, Cervantes, Laura I. and Irie C. Cervantes and Laura I. were in a relationship and had a daughter together. The people present took turns shooting guns, which included a nickel-plated nine-millimeter handgun. Cervantes testified Valenzuela and Israel Barajas often passed the nickel-plated gun back and forth. Barajas and Valenzuela referred to one another as cousins, a term that some close friends use to refer to each other. Laura I. testified she saw Valenzuela with a gun with a silver or gray handle and a black barrel. Sean B. testified Barajas had the nine-millimeter and ammunition. Sean B. further stated that Barajas took the nine-millimeter gun with him when he left the party.

Sheriff's deputies arrived at about 2:30 a.m. on a report of shots fired. Valenzuela ran away while Sean B. and Cervantes stayed put. Deputies found 13 nine-millimeter casings and some 12-gauge shotgun casings in some dirt. They did not appear to have been there very long. Sean B. was arrested with a live round in his pocket that had "WCC" and "12" in the headstamp.

## III. December 1, 2012 — Luis Morales and Benjamin Mariano murders

On the evening of November 30 and continuing into the early morning hours of December 1, Mariah R. hosted a party at her apartment, near Canal Street and 23rd Street in Merced. Cervantes was Mariah's neighbor at the time.

Laura I. testified Valenzuela and Irie C. were spending the night at her and Cervantes's apartment that night. Laura I. and Irie C. were at home while Valenzuela and Cervantes left to "go to a party or a bar to go out drinking."

Mariah R.'s party was a relatively small gathering. People at the party included Valenzuela; Cervantes; Cervantes's friend, Nicholas B.; Cervantes's friend, Kenrick; Kenrick's girlfriend; and Mariah R. Nicholas B. testified[5] that Valenzuela was "showing around" a chrome handgun in his waist at the party.

Morales and Mariano arrived at the party. Mariah R. testified Morales and Mariano were the first guests to arrive, while Cervantes testified Morales and Mariano arrived after everyone else. Mariah R. knew Morales and Mariano were gang members of a Norteno subset called "RBL," an acronym for Rebels Before Locs; Cervantes also knew them both to be Norteno gang members. When Valenzuela arrived at the party with Cervantes, Mariah R. noticed Valenzuela was dressed in red and had a tattoo of the letters "SF" on his cheek. Mariah R. asked Valenzuela if he "banged," meaning is he associated with a gang, and Valenzuela told her he did not. Mariah R. did not want to have any problems caused by having a bad "mix" in her home.

Although Valenzuela denied to Mariah R. being a gang member, he was a Norteno dropout and a member of the Northern Rider gang. His "SF" tattoo was a common symbol of the Northern Riders, standing for "sucker free." Law enforcement officers testified that Northern Riders and Nortenos were bitter rivals. Northern Riders considered the Norteno gang to be run by an oppressive hierarchy, and Northern Riders considered Norteno members to be "suckers" for submitting themselves to that hierarchy. Nortenos despise people who drop out of the Norteno gang, and often assault or kill dropouts.

Cervantes testified that Morales and Mariano confronted Valenzuela, asking him if he was a dropout and if the tattoo on his face stood for "sucker free." Valenzuela denied being a dropout and said he was a 49ers fan.

---

[5] Nicholas B. testified at Valenzuela's preliminary hearing but was unavailable to testify at trial. Nicholas B.'s preliminary hearing testimony was read to the jury.

8.

After this confrontation, Mariah R. told everyone to leave. The women at the party left in a car while Morales and Mariano walked down 23rd Street toward Canal Street. Cervantes, Valenzuela, and Nicholas B. were outside the apartment smoking. According to Cervantes, Valenzuela wanted to confront Morales and Mariano for having questioned his gang status, and said to Cervantes, "Let's go kick their asses." Cervantes told him he wanted nothing to do with it. Cervantes testified Valenzuela began "power walking" toward 23rd Street, and Cervantes and Nicholas B. followed. Nicholas B. testified he did not follow.

Cervantes testified Valenzuela "ran up behind" Mariano and Morales and shot Morales as he started to turn around to face Valenzuela. Mariano also turned around and said something like, "No. Don't—." Mid-sentence, Valenzuela shot him, too.

Nicholas B. testified he did not see Valenzuela shoot but testified Valenzuela must have been the shooter because Cervantes "wasn't in the proximity." Nicholas B. said they "all ran" after the shots, and said he believed that Morales and Mariano "seemed to be running fine" after the shots.

Nicholas B. ran back to his own apartment. Cervantes ran to his grandfather's house, a short distance from Laura I.'s apartment. He called Laura I. from his grandfather's house and asked her to look around to see if police were there. He returned to Laura I.'s apartment soon after.

Cervantes testified Valenzuela was at Laura I.'s apartment when he arrived, but Laura I. testified Cervantes and Valenzuela returned together, looking "frazzled" and "on full alert." Valenzuela then called a person named "Nick," who came and picked up Valenzuela and Irie C. Cervantes then left, telling Laura I. he had to go look for his friend. While gone, he called and asked Laura I. to look outside to see if anyone was approaching the apartment.

Cervantes looked frightened to Laura I. when he returned and kept looking out the windows. He told Laura I. to take their daughter and stay in the bathroom. Cervantes

9.

told her to call 911 and say there are people in the alleyway with a gun, which Cervantes knew was not true. Laura I. and her daughter stayed in the bathroom for at least an hour before Cervantes said they could come out.

Mariah R. and others returned to the apartment after being gone about an hour. A second party started up. Mariah R. said police came by around 4:00 a.m. Mariah R. learned later that morning her friends had been killed.

About 4:50 a.m., Merced Police Officer Jeremy Salyers responded to a call of a group of people outside with one possibly having a firearm. At 23rd Street and Canal Street, he found Morales and Mariano's bodies in the grass. There was some rigor mortis in the bodies. Officer Salyers had responded to a shots fired call hours earlier but did not see the bodies. Spent cartridge casings at the scene had the same markings as those found at the Jacobo scene.

Autopsies performed on Morales and Mariano showed both were shot twice in the head. One of the gunshot wounds on Mariano showed stippling, indicating a shot fired from intermediate range. A bullet was recovered from Morales's body bag.

On December 22, George G., Barajas's former brother-in-law, saw Valenzuela and Barajas at a house. There, in a conversation with Barajas, Valenzuela described how he and "Patrick" were at a party when he was confronted by two people because he had dropped out of a gang. Valenzuela said that when he went outside, rather than fighting, he took out a gun and shot them.

## IV.     December 23, 2012 — attempted murder of Jonathan T.

According to Laura I., she and Cervantes were broken up toward the end of 2012. But Cervantes testified he and Laura I. were still together on December 23. On the evening of December 22, Jonathan T. was on leave from the Navy and went out with a few friends, including Laura I. Jonathan T. and Laura I. went to her apartment late in the evening and fell asleep watching movies.

10.

Cervantes was also out that night drinking. Barajas came and picked up him and took him to the Shaffer Road house where they met up with Valenzuela. The three of them picked up Irie C. and then went to get Laura I. Cervantes lost his keys, so he knocked on the apartment door.

Laura I. opened the door and Cervantes came inside along with Valenzuela and Barajas. Laura I. knew Barajas as "Playboy." Cervantes saw Jonathan T. and began attacking him; Valenzuela and Barajas joined in the attack. Jonathan T. was getting choked, punched, and kicked. When Laura I. told them to stop, Valenzuela pointed a small black handgun at her face and told her to sit down and stay there. Valenzuela began pistol-whipping Jonathan T. with the gun. The gun broke apart during the assault.

Jonathan T. testified he heard someone say, "Let's sleep this fool," which he understood to mean, "Let's kill him." Laura I. testified she heard either Valenzuela or Barajas ask Cervantes if it was okay to kill Jonathan T., and Cervantes said yes. Cervantes testified Barajas pulled out the nickel-plated gun and pulled the trigger, but nothing happened. Jonathan T. broke free from the chokehold he was in, and the fight went outside.

The struggle ensued again outside, and Jonathan T. was placed into another chokehold. He broke free from the chokehold, ran to the person holding the pistol at that time, and "threw it to the side." He then ran away and heard two gunshots as he fled. Cervantes testified Barajas was the one who fired two shots as Jonathan T. fled.

At 5:54 a.m., a police officer responded to a call of shots fired at 23rd and K Street. The officer found Jonathan T., who was bleeding. Officers collected a spring to a handgun and the end of a handgun magazine in front of Laura I.'s apartment near a pool of blood, a red and gray hat under the stairway near the apartment, and a few cartridge casings near a pathway leading to the alley. Barajas's DNA was on the hat. The casings had the same headstamp as those found at the Jacobo and Morales and Mariano crime scenes.

11.

The morning after the Jonathan T. incident, George G. saw Valenzuela at Barajas's and George G.'s residence. George G. saw a chrome handgun that day but could not remember who had it. Barajas was arrested and was convicted in 2017 of assault with a semiautomatic firearm for his role in the Jonathan T. incident.

After Barajas was arrested and in jail, he asked George G. over the telephone to dig up a "fishing pole" in George G.'s backyard and go fishing with it. George G. did not understand until Barajas said a "pedazo," which George G. knew meant a "piece." George G. and Barajas's then-wife, Erica R., dug up the gun, which was wrapped in a towel and inside a Ziploc bag; George G. testified it was the same handgun he saw the morning after the Jonathan T. incident. Barajas told George G. to go fishing with it, still referring to it as a fishing pole; George G. went out to Don Pedro Lake and threw the gun into some rocks.

Valenzuela was arrested December 27 at the Shaffer Road address after a brief foot chase. A .22-caliber rifle was found in Valenzuela's room, as well as identification cards for Valenzuela and Irie C. Police also found marijuana in the house.

## V. Firearm evidence

In January 2014, George G. told Detective Joseph Deliman about the gun. The gun was found at the lake and submitted to the Department of Justice for testing. The magazine recovered at the Jonathan T. scene did not match the firearm recovered at the lake.

The nine-millimeter cartridge casings recovered from the Jacobo scene, the Morales-Mariano scene, Jonathan T. scene, and from the Shaffer Road incident were determined to have all been fired from the Smith & Wesson firearm recovered from the lake. Six of the seven bullets recovered from the scenes were fired from the same firearm, which, from class characteristics was either a Greek Nationale or Smith & Wesson firearm; the seventh bullet was too badly damaged for comparison. The Smith & Wesson firearm recovered was too rusted to determine whether it had fired the bullets.

12.

The "WCC" on the headstamp of the recovered casings stands for Western Cartridge Company; the "12" stands for the year of manufacture, which would be 2012; and the encircled cross is the NATO symbol, indicating the round was intended for military use. It is not uncommon for surplus military ammunition to be sold to the public.

## VI. Gang evidence

The Northern Riders gang was started by a disaffected Norteno gang member named Maurice V. Maurice V. dropped out of the Norteno gang in 2000 while he was in prison. The symbol of the group is the Playboy bunny, which symbolizes a "free-going" attitude of doing what one wants to do. Besides the Playboy bunny, the Northern Riders use the symbols "NR" and "SF," which stands for "sucker free." Northern Riders refer to Norteno members as suckers for submitting themselves to the Norteno's strict hierarchy. Over time, the Northern Rider gang began to just be called the Riders.

The Northern Riders and the Nortenos are bitter enemies. Northern Riders and Nortenos members are supposed to assault each other whenever they see one another anywhere. If a Norteno comes across a Norteno dropout, the Norteno might try to assault or even kill the dropout on the spot.

In December 2012, there were 15 documented Northern Rider gang members in Merced. The gang's primary activities include assaults, drive-by shootings, selling narcotics, kidnappings, rape, homicides, robbery, and weapons possession. The Northern Riders gang benefits by its members committing violent crimes on rival members because it instills fear, helps with recruitment, and maintains respect for the gang. Committing a murder or attempted murder provides a gang member with credibility and benefits the gang by instilling fear in the community, which ultimately helps to intimidate crime witnesses. A cooperating witness is at risk of being targeted by the gang, and witnesses are often afraid to cooperate for this reason.

Valenzuela is a documented Northern Rider member. On at least two occasions in 2012 he admitted to law enforcement officers he was a Northern Rider. Valenzuela's

13.

monikers are Pistol Pete and Maniac. Barajas, who uses the moniker Playboy, is also a Northern Rider member. Cervantes was also a Northern Rider member in December 2012.

The prosecution presented evidence of predicate offenses committed by three other Northern Riders. The evidence came from the testimony of James Rochester, a special agent for the California Department of Corrections and Rehabilitation who testified as a gang expert. The first other Northern Rider member was Isaiah Serena. Rochester opined Serena was a Northern Rider on December 1, 2012, based on reading reports and other documents. Records showed Serena was convicted in August 2013 of assault with a firearm (§ 245, subd. (a)(2)) and other firearm-related offenses.

Next was Jaime Villifan. Rochester stated Villifan was an active Northern Rider member on December 1, 2012. This was based on Villifan admitting to Rochester he was a Northern Rider. Records showed Villifan was convicted by plea of two counts of repeat domestic violence (§ 273.5, subd. (e)(1)) in December 2011 and one count of felony vandalism (§ 594, subd. (b)(1)) in June 2012.

Last was Cesar Alex Villifan. Alex admitted to Rochester he was a Northern Rider member, which informed Rochester's opinion that Alex was an active member on December 1, 2012. Records showed Alex was convicted by plea of carrying a concealed dirk or dagger (§ 21310) in 2015, of inflicting corporal injury (§ 273.5, subd. (a)) in January 2014, and of grand theft from a person (§ 487, subd. (c)) in March 2012.

Morales and Mariano were both Norteno gang members who belonged to a subset called Merced Ghetto Boys.[6]

---

[6] We note that Mariah R. testified Morales and Mariano were members of a different Norteno subset, Rebels Before Locs.

14.

**DISCUSSION**

## I. Sufficiency of the evidence for the Jacobo murder

Valenzuela contends his conviction for the first degree murder of Jacobo must be reversed because there was insufficient evidence of premeditation and deliberation to support the verdict. We disagree.

### A. Sufficiency of the evidence

We uphold the sufficiency of the evidence in support of a conviction if the record, viewed in the light most favorable to the judgment, contains substantial evidence that is " 'reasonable, credible, and of solid value' " from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Morales* (2020) 10 Cal.5th 76, 88 (*Morales*).) We presume in support of the judgment " ' " 'the existence of every fact the trier of fact could reasonably deduce from the evidence.' " ' " (*Ibid*; *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 626.)

This standard also applies when the conviction rests on circumstantial evidence. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1263 (*Virgil*); *People v. Kraft* (2000) 23 Cal.4th 978, 1053; *People v. Redd* (2014) 228 Cal.App.4th 449, 457.) Though a jury must acquit a defendant if it finds the circumstantial evidence supporting a possible conviction susceptible to an interpretation suggesting innocence, " ' "it is the jury, not the appellate court, that must be convinced of the defendant's guilt beyond a reasonable doubt." ' " (*Virgil, supra,* at p. 1263.) " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*Ibid.*)

### B. Relevant homicide law and analysis

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd. (a).) First degree murder is "willful, deliberate, and premeditated." (§ 189, subd. (a).) Conduct is premeditated if " ' " ' "considered

beforehand" ' " ' " and deliberate if " ' " ' "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." ' " ' " (*Morales, supra,* 10 Cal.5th at p. 88.) " ' "An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." ' " (*Ibid*; *People v. Anderson* (1968) 70 Cal.2d 15, 24—34 (*Anderson*).) The extent of the reflection, not the duration of time, is the true test of premeditation and deliberation, for " 'thoughts may follow each other with great rapidity, and cold, calculated judgment may be arrived at quickly ....' " (*People v. Potts* (2019) 6 Cal.5th 1012, 1027 (*Potts*), citing *People v. Thomas* (1945) 25 Cal.2d 880, 900.)

" 'Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 942.) To reduce a murder to second degree, "premeditation and deliberation may be negated by heat of passion arising from provocation." (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332.) "If the provocation would not cause an average person to experience deadly passion but it precludes the defendant from subjectively deliberating or premeditating, the crime is second degree murder. [Citation.] If the provocation would cause a reasonable person to react with deadly passion, the defendant is deemed to have acted without malice so as to further reduce the crime to voluntary manslaughter." (*Ibid.*) Here, the jury returned a verdict of first degree murder because it found premeditation and deliberation.

Generally, three categories of evidence establish premeditation and deliberation: (1) planning activity—"facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing"; (2) motive—"facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a

16.

'motive' to kill the victim"; and (3) manner of killing—"facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason'...." (*Anderson, supra,* 70 Cal.2d at pp. 26—27.)

*Anderson, supra,* 70 Cal.2d 15 describes three instances where a court will usually find premeditation and deliberation: (i) evidence of all three of the above categories; (ii) extremely strong evidence of planning activity; or (iii) evidence of motive in conjunction with either evidence of planning activity or evidence of the manner of killing. (*Id.* at pp. 26—27.) That said, in the years since *Anderson,* our Supreme Court has " 'emphasized that its guidelines are descriptive and neither normative nor exhaustive, and that reviewing courts need not accord them any particular weight.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 324.) "*Anderson* provides 'a framework to aid in appellate review,' but it does not 'define the elements of first-degree murder or alter the substantive law of murder in any way.' " (*Morales, supra,* 10 Cal.5th at p. 89, citing *People v. Perez* (1992) 2 Cal.4th 1117, 1125.)

Valenzuela argues nothing in the record shows he had a motive to kill Jacobo, planned the murder, or committed the murder in a manner suggesting premeditation.

Here, premeditation and deliberation were sufficiently established by the manner of killing. There is a long line of Supreme Court cases holding that an execution-style killing, such as shots to a victim's head from close range, is sufficiently particular and exacting to support an inference that the defendant killed pursuant to a preconceived design. (*People v. Pettigrew* (2021) 62 Cal.App.5th 477, 493—494; *People v. Gomez* (2018) 6 Cal.5th 243, 283 [fact victims were shot from close range in the head or neck showed premeditation and deliberation]; *People v. Casares* (2016) 62 Cal.4th 808, 825, overruled on another ground by *People v. Dalton* (2019) 7 Cal.5th 166, 214 ["The method by which defendant killed [the victim] (a gunshot to the back of the head at very

17.

close range) was sufficiently particular and exacting to support the inference he intentionally killed him according to a preconceived design"]; *People v. Cage* (2015) 62 Cal.4th 256, 277; *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 295 [close-range shooting without provocation or evidence of a struggle supports inference of premeditation and deliberation]; *People v. Thompson* (2010) 49 Cal.4th 79, 114—115 [same]; *People v. Romero* (2008) 44 Cal.4th 386, 401 [where victim was killed by a single gunshot fired from a gun placed against his head, "this execution-style manner of killing supports a finding of premeditation and deliberation when ... there is no indication of a struggle"]; *People v. Halvorsen* (2007) 42 Cal.4th 379, 422 [victims were shot in the head or neck from within a few feet, a method of killing particular and exacting enough to permit inference that defendant was acting according to a preconceived design]; *People v. Stewart* (2004) 33 Cal.4th 425, 495 ["The killing was accomplished by a single execution-style shot fired from close range into the victim's forehead, in circumstances showing no evidence of a struggle. This plainly supports a finding of premeditation and deliberation"]; *People v. Marks* (2003) 31 Cal.4th 197, 230; *People v. Morris* (1988) 46 Cal.3d 1, 23, disapproved on another ground by *In re Sassounian* (1995) 9 Cal.4th 535, 543—545, fns. 5 & 6 [victim was shot twice, in the head and the abdomen, from close range; "Wounds of this nature, as a result of shots fired from point-blank range, evince a calculated and deliberate design to kill, not an indiscriminate shooting in the heat of passion"]; *People v. Bloyd* (1987) 43 Cal.3d 333, 348.)

Indeed, courts have found an execution-style manner of killing may provide sufficient evidence of premeditation and deliberation, even without any evidence showing planning or motive. The "method of killing alone can sometimes support a conclusion that the evidence sufficed for a finding of premeditated, deliberate murder." (*People v. Memro* (1995) 11 Cal.4th 786, 863—864.) In *People v. Hawkins* (1995) 10 Cal.4th 920, for example, the victim was shot twice in the back of the neck and head from close range, at an angle suggesting he might have been kneeling or crouching at the

time, and little evidence suggested a struggle. (*Id.* at p. 956.) The court concluded that "although evidence of planning and motive was indeed minimal if not totally absent … the manner-of-killing evidence was sufficiently strong to permit a trier of fact to conclude beyond a reasonable doubt that defendant committed the … murder with premeditation and deliberation." (*Id.* at p. 957, disapproved on another ground by *People v. Lasko* (2000) 23 Cal.4th 101, 109—111; see also, e.g., *People v. Concha* (2010) 182 Cal.App.4th 1072, 1084—1085 ["This court has ... concluded that an execution-style killing may be committed with such calculation that the manner of killing will support a jury finding of premeditation and deliberation, despite little or no evidence of planning and motive"]; cf. *People v. Boatman* (2013) 221 Cal.App.4th 1253, 1269 ["Cases that have found sufficient evidence of premeditation and deliberation in the absence of planning or motive evidence are those in which '[t]he manner of the killing clearly suggests an execution-style murder' "].)

Here, there is sufficient evidence to support an inference that the manner of killing was essentially an execution-style murder. The evidence supports a reasonable inference that Valenzuela shot Jacobo once in the middle of 6th Street, wounding him, and Jacobo somehow moved onto the south sidewalk. We have reviewed photographs from the Jacobo crime scene. The trail of blood leading from the middle of the street to the sidewalk was not droplets of blood, but large patches of blood, evidencing that Jacobo was bleeding heavily after he was first shot. After the first shot, Valenzuela moved over to where Jacobo was on the sidewalk, vulnerable, and delivered the rest of the shots, which included at least two headshots, killing Jacobo execution-style. The jury could rationally deduce that at least two of the later shots were headshots from the fact that Jacobo sustained three headshots total.

The timing of the shots is also crucial besides the execution-style manner of killing. William G. testified he heard one shot followed by several more about 30 to 35 seconds later. The execution-style method of killing, combined with the time gap

19.

between the two groups of shots, supports a finding that Valenzuela premeditated and deliberated killing Jacobo in the 30 to 35 seconds between the two groups of shots. (*Potts, supra,* 6 Cal.5th at p. 1027 [" 'thoughts may follow each other with great rapidity, and cold, calculated judgment may be arrived at quickly' "].) The jury could rationally find that Valenzuela premeditated and deliberated the killing no later than during the 30 to 35 seconds between the first shot and the later shots, during which Valenzuela moved over to a wounded Jacobo with a gun and had enough time to think rationally about shooting Jacobo more times.

Sufficient evidence supported the conviction for the first degree murder of Jacobo in count 3.

## II.     Denial of motion to sever

Valenzuela moved to sever count 3, the murder of Jacobo, before trial. He argued that the evidence he committed the Jacobo murder was "extremely weak" compared with the stronger evidence of his involvement in the other charged crimes, and that the evidence from the other crimes was being used to bolster the Jacobo charge. Following a hearing, the court denied Valenzuela's motion to sever, finding the ballistics evidence in the Morales-Mariano incident would be cross-admissible in a separate trial of the Jacobo incident. Valenzuela contends the court erred. We disagree.

### A.     Law and analysis

" ' " '[B]ecause consolidation or joinder of charged offenses ordinarily promotes efficiency, that is the course of action preferred by the law.' " ' " (*People v. O'Malley* (2016) 62 Cal.4th 944, 967 (*O'Malley*).) Section 954 embodies this preference, allowing for the joint trial of "two or more different offenses connected together in their commission … or two or more different offenses of the same class of crimes or offenses …." Here, the three murders and one attempted murder are undoubtedly of the same class. "Thus, they were properly joined unless the defense made such a ' "clear showing of potential prejudice" ' that the trial court's denial of defendant's severance

20.

motion amounted to an abuse of discretion." (*O'Malley, supra,* 62 Cal.4th at pp. 967—968.) " ' "A party seeking severance [of properly joined charged offenses] must make a *stronger* showing of potential prejudice than would be necessary to exclude other-crimes evidence in a severed trial." (*People v. Soper* (2009) 45 Cal.4th 759, 774 (*Soper*).)

"In determining whether a trial court's refusal to sever charges amounts to an abuse of discretion, we consider four factors: (1) whether evidence of the crimes to be jointly tried is cross-admissible; (2) whether some charges are unusually likely to inflame the jury against the defendant; (3) whether a weak case has been joined with a stronger case so that the spillover effect of aggregate evidence might alter the outcome of some or all of the charges; and (4) whether any charge carries the death penalty or the joinder of charges converts the matter into a capital case." (*O'Malley, supra,* 62 Cal.4th at p. 968.)

We review the denial of the motion based on the facts available when the court ruled on the motion. (*People v. Simon* (2016) 1 Cal.5th 98, 122 (*Simon*).) We have reviewed the preliminary hearing testimony and observe that it substantially tracks the relevant evidence produced at trial.

Valenzuela is unclear in his briefing as to how he was prejudiced by the court's denial of severance. It appears he is contending the denial of the motion to sever prejudiced him only with respect to count 3, the Jacobo murder charge. We find Valenzuela has failed to establish a "clear showing" of potential prejudice under the factors spelled out in *O'Malley*, and thus we cannot conclude the trial court abused its discretion in denying his motion to sever.

### 1.    *Cross-admissibility*

Valenzuela admits that the ballistics evidence from the Morales-Mariano murders and the Jonathan T. attempted murder would be admissible in a separate trial of the Jacobo incident to prove identity. But he contends that no evidence from those other crimes would be admissible in a separate trial because such evidence would be unduly prejudicial.

21.

The question of cross-admissibility is governed by Evidence Code section 1101:

"(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.

"(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act.

"(c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

The California Supreme Court has explained: "The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity. For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403.) Valenzuela concedes the ballistics evidence meets this very high standard for admissibility. Indeed, the ballistics evidence from all of the other crime scenes would certainly be admissible on the issue of Valenzuela's identity as Jacobo's killer if the Jacobo incident were tried separately. But he argues that all other evidence from the Morales-Mariano and Jonathan T. incidents would be inadmissible. He is incorrect because the ballistics evidence would have no foundation if no other evidence from the other crimes were admitted. (Evid. Code, §§ 400—405.) For that reason, at least some evidence proving Valenzuela's involvement in the other incidents would be admissible in a separate trial of the Jacobo incident.

We do agree with Valenzuela, though, that the gang evidence relevant to the Morales-Mariano murders might be excluded in a separate trial of the Jacobo charge under Evidence Code section 352. That section gives the trial court the discretion to exclude evidence if its probative value is substantially outweighed by the probability it will create substantial danger of undue prejudice. (Evid. Code, § 352.)

In a separate trial of the Jacobo incident, the jury should hear evidence that the motive for the crimes arose out of an argument Valenzuela had with Morales and Mariano at the party, for this would be relevant to provide necessary context to the crime. Specifically, it would show Valenzuela had some motive to kill Morales and Mariano. But it is possible the trial court could rule that the jury should not hear any gang evidence, including evidence of anyone's gang status, because such evidence would have little to no probative value on the issue of identity as it relates to the Jacobo incident and would create a substantial danger of undue prejudice. That is because the gang evidence was not necessary to prove Valenzuela's identity as the shooter in the Mariano-Morales incident. Even if evidence of the subject of the argument Valenzuela had with the two Nortenos were excluded, the Jacobo jury would still be presented with an overwhelming amount of evidence that Valenzuela was the one who shot Morales and Mariano.

We conclude that other than possibly the gang evidence, evidence of the Mariano-Morales and Jonathan T. crimes would be admissible in a separate trial of the Jacobo incident. That there might not be total cross-admissibility is not a basis for concluding it was error to deny severance. (*People v. Turner* (2021) 73 Cal.App.5th 117, 126 ["[a]lthough cross-admissibility may be an 'independently sufficient condition justifying a trial court's denial of severance, it is not a necessary one' "].)

### 2. *Particularly inflammatory charges*

Valenzuela argues the gang evidence was "highly inflammatory" and created a danger the jury would convict him of the Jacobo murder due to his membership in a violent street gang. His argument implies there was a chance the jury inferred

23.

Valenzuela had a criminal disposition because he was a gang member, and from that improperly inferred he was guilty of the Jacobo murder. Valenzuela does not contend that the facts of the Morales-Mariano murders and the Jonathan T. attempted murder, on the one hand, were particularly inflammatory compared to the facts of the Jacobo murder, on the other. His argument on this factor focuses on the inflammatory effect of the gang evidence.

There is little chance that joining the Morales-Mariano and Jonathan T. incidents prejudiced Valenzuela with respect to the Jacobo incident. True, the California Supreme Court "ha[s] recognized that gang evidence, even if relevant, can be 'highly inflammatory.' " (*Simon, supra,* 1 Cal.5th at p. 125.) But Valenzuela does not even attempt to explain how the gang evidence presented here "was sufficiently inflammatory that denial of severance constituted an abuse of discretion." (*Ibid.*) Indeed, the section of his opening brief dedicated to discussing the inflammatory nature of the gang evidence is only one paragraph long.

At any rate, the gang evidence presented here was not unduly inflammatory. For one, the inflammatory effect of the gang evidence, which was relevant only to the Morales-Mariano murders, was not so strong when considering the nature of the Jacobo murder. In our view, the Jacobo murder was arguably the most chilling of the three incidents here, even though the Jacobo murder involved just one victim and the Morales-Mariano incident involved two. Jacobo was a homeless man who was gunned down in an execution-style slaying for no apparent reason. There was no evidence Jacobo did anything to provoke Valenzuela. This differs from the Morales-Mariano incident, where Morales-Mariano did an incredibly disrespectful and inciteful thing—challenged a rival gang member in front of other people. The Jonathan T. incident was also less chilling than the Jacobo incident for the simple reason that Jonathan T. was not killed.

Moreover, any inflammatory effect of the gang evidence was not prejudicial because the Jacobo case was supported by strong evidence. The strongest evidence that

24.

Valenzuela murdered Jacobo was the ballistics evidence, which showed the same gun was used in all of the charged offenses. Cervantes's testimony that Valenzuela told him about the crime provided additional strong support. George G. also testified to hearing Valenzuela talking about killing Jacobo. William G. testified he saw a white Dodge pickup truck with a camper shell drive away from the scene. Michael R. told a detective he thought he heard his truck start up the night Jacobo was killed, and there was evidence Valenzuela had access to Michael R.'s car keys. Granted, there were no eyewitnesses like there were for the Mariano-Morales and Jonathan T. incidents, and therefore the evidence of Valenzuela's guilt in the Jacobo incident may not have been as comparatively strong, but the evidence of Valenzuela's guilt of the Jacobo murder was still objectively strong.

Valenzuela has not shown the potentially inflammatory effect of the gang evidence would have altered the outcome of the Jacobo charge.

### 3. *Weak case joined to a strong case*

Valenzuela contends the Jacobo incident was a weak case that needed joinder to bolster the likelihood of conviction. We disagree, for the reasons we explained in the previous section.

"The core prejudice concern arising in connection with this issue is that jurors may aggregate evidence and convict on weak charges that might not merit conviction in separate trials." (*Simon, supra,* 1 Cal.5th at p. 127.) But "we will find no abuse of discretion [when] the evidence of guilt for each of the joined incidents is sufficiently compelling." (*Ibid.*) Valenzuela does not contend the Morales-Mariano and Jonathan T. incidents needed bolstering—only the Jacobo incident. Valenzuela emphasizes there were no eyewitnesses to the Jacobo murder; specifically, that no one identified Valenzuela as the one who shot Jacobo that night. But Valenzuela overlooks that there were many people who testified as to facts that created a strong case for his guilt. Again, Cervantes and George G. testified they heard Valenzuela admit murdering someone.

25.

Valenzuela also ignores William G.'s testimony that he saw a Dodge pickup with a camper shell driving away from the murder scene, as well as the related evidence that Michael R. heard his truck start up that night. All of this evidence, combined with the ballistics evidence, makes for a very strong case for Valenzuela's identity as Jacobo's killer. As we explained in section I of our Discussion, there was also much solid, credible evidence that the Jacobo murder was premediated and deliberated, and thus that the murder was in the first degree.

The Jacobo murder was supported by strong evidence, perhaps not as strong as the evidence supporting the Morales-Mariano and Jonathan T. incidents, and therefore we find no clear showing of potential prejudice under this factor.[7]

### 4. Federal due process

Valenzuela maintains that joinder, even if proper under state law, resulted in violation of his federal constitutional rights. "In evaluating that claim, 'we must … inquire whether events after the court's ruling demonstrate that joinder actually resulted in "gross unfairness" amounting to a denial of defendant's constitutional right to fair trial or due process of law.' " (*O'Malley, supra,* 62 Cal.4th at p. 969.) We find no gross unfairness on this record. As discussed, there was no joinder of a weak case to a strong case, the evidence of the Morales-Mariano murders and the Jonathan T. incident was not so inflammatory compared to the evidence of the Jacobo murder, and there was a significant amount of cross-admissible evidence. Although the gang evidence may not have been admissible in a separate trial of the Jacobo murder, this evidence had little potential to cause the jury to improperly convict Valenzuela of the first degree murder of Jacobo. To that point, we have concluded there was sufficient evidence to convict Valenzuela of Jacobo's first degree murder. The jury was instructed that it must consider

---

[7] The factor of whether any charge carries the death penalty or the joinder of charges converts the matter into a capital case is not relevant here.

26.

each count separately, and that it could only consider evidence of gang activity for limited, specified purposes. "We presume the jury understood and followed the instruction[s]." (*People v. Homick* (2012) 55 Cal.4th 816, 873) Valenzuela "has not met his high burden of establishing that the trial was grossly unfair and that he was denied due process of law." (*Soper, supra,* 45 Cal.4th at p. 783.)

### III. Closing and rebuttal argument

Valenzuela argues the prosecutor improperly asked the jurors to participate in two experiments, resulting in juror misconduct. During closing argument, the prosecutor asked the jurors to point their fingers at his head as he moved about the courtroom so that the jurors could see if they had any difficulty in keeping their fingers pointed at his head. The apparent purpose was to make the jurors think how difficult it would be to shoot a moving person in the head from a distance versus shooting them from a closer range. During rebuttal argument, the prosecutor presented the jurors with three red neckties and asked them if they could pick out the one he wore during argument. The apparent purpose was to bring to the jurors' minds the common phenomenon of being unable to describe an object with any appreciable specificity, but being able to identity it with relative certainty when one sees it again. This was relevant to the fact that some witnesses were at first unable to remember certain people or things during their testimony, but were later able to recall after apparently having had their memories jogged. Valenzuela argues these experiments were prejudicial error. We disagree.

Valenzuela also contends the prosecutor argued a theory of the Jacobo murder not supported by the evidence. We also disagree.

As a threshold matter, we conclude Valenzuela forfeited all his claims by not objecting below. (*People v. Scott* (1994) 9 Cal.4th 331, 355—356.) Anticipating forfeiture, he contends his trial counsel provided ineffective assistance for failing to object. We conclude Valenzuela forfeited all his claims.

To establish ineffective assistance of counsel based on counsel's failure to object, Valenzuela must show (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687—688 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216—217 (*Ledesma*).) To establish prejudice, Valenzuela must make a showing "sufficient to undermine confidence in the outcome" that but for counsel's deficient performance there was a "reasonable probability" "the result of the proceeding would have been different." (*Strickland,* at p. 694; *Ledesma,* at pp. 217—218.) On review, we can adjudicate an ineffective assistance claim solely on the issue of prejudice without determining the reasonableness of counsel's performance. (*Strickland,* at p. 697; *People v. Hester* (2000) 22 Cal.4th 290, 296—297.) We do so here because there was no juror misconduct nor any improper argument from the prosecutor, and therefore there is no reasonable probability an objection would have been beneficial.

## A. The experiments

The jurors here were instructed pursuant to CALCRIM No. 201 that they should not "do any research regarding the case" or "conduct any tests or experiments." The law on the subject, however, is less categorical. In the words of the California Supreme Court: "Not every jury experiment constitutes misconduct. Improper experiments are those that allow the jury to discover *new* evidence by delving into areas not examined during trial. The distinction between proper and improper jury conduct turns on this difference. The jury may weigh and evaluate the evidence it has received. It is entitled to scrutinize that evidence, subjecting it to careful consideration by testing all reasonable inferences. It may reexamine the evidence in a slightly different context as long as that evaluation is within the ' "scope and purview of the evidence." ' [Citation.] What the jury cannot do is conduct a new investigation going beyond the evidence admitted." (*People v. Collins* (2010) 49 Cal.4th 175, 249 (*Collins*).)

Moreover, " ' "jurors must be given enough latitude in their deliberations to permit them to use common experiences and illustrations in reaching their verdicts." ' " (*People v. Bogle* (1995) 41 Cal.App.4th 770, 778 (*Bogle*).) "They may also 'bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience.' " (*People v. Vigil* (2011) 191 Cal.App.4th 1474, 1484 (*Vigil*).)

"When jury misconduct has occurred, prejudice to the defendant is presumed and the burden is on the prosecution to rebut the presumption by showing that the misconduct did not affect the jury's decision." (*People v. Wismer* (2017) 10 Cal.App.5th 1328, 1337.)

We believe this juror misconduct framework applies to the issues Valenzuela frames here even though we have the unique situation where the complained of experiments were prompted by an attorney. This is because the effect of any improper jury experiment would be the same regardless of who prompted it—whether a juror, an attorney, or someone else.

### 1. The finger pointing experiment

During closing argument, the prosecutor discussed how the similarity of the three murders can be considered to determine Valenzuela's guilt on each of the three. The prosecutor noted the jury was instructed that if it decided that defendant committed one or more of the murders or attempted murder, it may rely on that determination for the limited purpose of deciding (1) whether Valenzuela acted with the intent to kill in each of the charged crimes, and (2) whether Valenzuela is the person who committed the three murders. In evaluating this evidence, the jury was allowed to consider the similarity or lack of similarity in the offenses.

The prosecutor focused on the fact that all three murder victims were shot in the head at least twice. The prosecutor believed this was a key similarity that not only demonstrated that the same person committed all three murders, but that the murders

were committed with premeditation and deliberation. During argument, the following occurred:

"[THE PROSECUTOR]: I want us to do a little exercise, if you don't mind; okay? It's going to be unusual. Everybody take your finger and point it at me. No. Point it at me. I know your fingers aren't loaded; so point it at me.

"[THE JURORS]: (Comply.)

"[THE PROSECUTOR]: Keep them pointed at me. (Moving.)

"Are you keeping it pointed at me?

"[THE JUROR]: Uh-huh.

"[THE PROSECUTOR]: Are you able to keep it on my head?

"[THE JURORS]: No.

"[THE PROSECUTOR]: Put two pounds in your hand and try to do it. I'm moving because I don't want you pointing your finger at me; okay?

"So how successful are you being at keeping your finger pointed at my head? Not very successful; right?

"It's not an easy thing. Any of you who have fired a pistol know that it's not an easy thing to shoot a space this big given a particular distance; all right? I'm not very far from you, and yet you're having a hard time, because I'm a moving target, keeping your finger pointed at me, at my head; right?

"How difficult is it to keep a pistol pointed at somebody's head and actually hit them in the head? If you've fired a pistol, you know that it's relatively difficult to put a round in a piece of paper the size of someone's head when it's sitting still. But if it's moving and trying to avoid having you put a bullet through it, it's going to be even that much more difficult.

"Yet what do we see in all of these cases? I contend to you this doesn't necessarily prove that the defendant is a fabulous shot. What it does prove to you, however, is there's a similarity between these crimes. And the similarity is this: The defendant wanted these people dead. How do you make sure somebody is dead? You shoot them in the head. You make sure you shoot them in the head.

*"This might as well be his signature. Because in every one of these cases, he got up on these people and shot them a couple of times in the head; okay?*

*"He shot Jacobo from a distance, and he chased him all across the street. And when Jacobo finally fell, he walked up on him and shot him a couple of times in the head, apparently.*

*"Mariano and Morales, he ran up on them, according to Cervantes, until he got close enough and started shooting them in the head and was able to shoot both of them in the head. Why? Because he ran up on them and was close enough.*

*"This is one of those similarities. It's very interesting about this case; okay? Because multiple shots to the head shows, A, specific intent to kill. Intent to kill, premeditation, with deliberation to do it. 'I want them dead, and I intend to kill them. I thought about it. This is how I'm going to do it.' And it also is evidence that connects all these crimes together."*
(Italics added.)

We first note that the record does not disclose how the prosecutor moved about the courtroom while the jurors had their fingers pointed at him. We do not know how far the prosecutor was away from the jurors, either. In that respect, the record can be characterized as undeveloped. However, the purpose of the experiment is clear from the italicized text. The prosecutor was trying to support the theory that Jacobo was shot in the head from close range in an execution-style killing after he had been wounded. In the prosecutor's view, this was more likely than Valenzuela shooting Jacobo multiple times in the head from a considerable distance. This is because, as the prosecutor tried to illustrate with the experiment, shooting a moving person in the head from a considerable distance is relatively difficult.

Valenzuela complains the experiment "created new evidence, abetted jury misconduct and created impermissible prosecutor dialogue with the jurors." He claims the experiment was "highly prejudicial." His argument implies that the impermissible "new evidence" created was that it "takes skill" to shoot a moving person in the head from a distance. But this seems to us to be a matter of common knowledge. Jurors may

31.

use common experience and illustrations in reaching their verdicts. (*Bogle, supra,* 41 Cal.App.4th at p. 778.) They are also allowed to bring to bear knowledge about general matters of fact that find their source in everyday life and experience. (*Vigil, supra,* 191 Cal.App.4th at p. 1484.) We believe the fact that it takes skill to shoot a moving person in the head from some distance is something that is a general matter of fact, or, at the very least, a fact that can be deduced from common experience and illustrations. In that vein, the prosecution's experiment, as far as we can tell from the record, was a simple "illustration" (*Bogle,* at p. 778) meant to get the jurors to draw on their own knowledge and think about how comparatively difficult it would be to shoot a moving person in the head from a distance versus shooting a still person in the head from closer range. We are not convinced the experiment was improper.

Additionally, the purpose of the experiment was clearly not to establish a scientific standard of how difficult it is to shoot someone from a specific distance, which the jurors could then apply to the evidence to reach a conclusion that they could regard as scientific fact. To have done that would have been to impermissibly delve into an area not examined at trial. (*Collins, supra,* 49 Cal.4th at p. 249.)

Moreover, we reject the undue import Valenzuela places on the fact that at least some of the jurors answered the prosecutor out loud as the prosecutor was conducting the demonstration. Valenzuela characterizes what happened as improper dialogue between the prosecutor and the jurors. When reading the record in context, though, it is easy to see that the prosecutor was not soliciting a response from the jurors when he asked, "Are you able to keep it at my head?" That question was not to solicit an answer, but to prompt the jurors to think about whether it was easy to do what the prosecutor asked them to do. After some of the jurors answered, "No," the prosecutor moved on with his argument as if he had received no response.

Even were we to conclude the experiment was improper and constituted juror misconduct, the prosecution has shown that the presumed error was not prejudicial. For

32.

one, the experiment would not have had much persuasive effect in our view because most people are aware it is comparatively difficult to shoot a moving person in the head. Additionally, we do not see how the experiment was even necessary in the first place because the evidence strongly supported the prosecution's theory that Jacobo was shot from a relatively close distance after he was wounded. The evidence strongly shows that Jacobo was shot once and wounded, and then was shot in the head more than once from a closer range in an execution-style slaying. There was a trail of blood leading from the middle of the street to the sidewalk, and there were cartridge casings found near Jacobo's body.

In sum, we do not see how the prosecutor's crude experiment had any meaningful effect on the jury's deliberations, and therefore we conclude any alleged error was not prejudicial. Finding no prejudice, we also conclude that Valenzuela's trial counsel was not ineffective for failing to object to it. The forfeiture doctrine applies.

### 2. The necktie experiment

During rebuttal, the prosecutor said the following:

"I want to do a little exercise, shall we?

"[¶] … [¶]

"I'm robbing you, and I'm wearing this tie; okay? I put a gun in your face. You think I'm going to shoot you. Luckily, I don't. I get scared off. I run away with the gun and your money and your cell phone; okay?

"So then you call the police, and the police ask you to describe the robber.

" 'Well, he was a very handsome gentleman, very well dressed, and he was wearing this tie.'

" 'Can you describe the tie for me?'

" 'Well, all right.'

"So think to yourselves. I don't want you to do it out loud, but think to yourselves. Describe the tie.

"All right. Now I am no longer standing in front of you. You're talking to the police. So what did the tie look like? Describe it in your own mind.

"You're probably going in your mind, 'Well, let's see. How would I describe that? That was a red tie, and it had a pattern on it.'

"What would—the officer would ask you, 'Well, was there anything else distinctive about it?'

" 'Well, I don't know. It had some other colors on it.'

" 'Can you be more specific about the description of that?'

" 'It was red.'

" 'What color red?'

" 'I don't know. It was just red. And it had other colors and had patterns on it.'

"That's probably the extent to which you have in your own mind to describe that tie; right? I don't expect you to answer.

"So then the officers do an investigation. And for whatever reason, they come up to you and they say, 'Can you identify the tie that was used'—Just a minute.

"(Brief pause.)

"[THE PROSECUTOR]: Here are three ties. All of them match the description. They're all red. They all have other colors. They all have patterns on them, et cetera. (Indicating.)

"Now I don't know, but I presume that when you see these three ties, you're able to pick out the one that the robber who was just about to kill you was wearing. Maybe you can't, but I presume that most of you are able to pick out the tie; okay?

"Why are you able to pick out the tie? You described it as a red tie. That fits the description of every tie here. You described it as having multi-colors. That fits the description of every tie here. It has a pattern. That fits

the description of every tie here. Why is it that you can pick out, I presume, the actual tie that I was wearing?

"Because the human mind works that way. You're able to—the human mind is able to distinguish variations in color, variations in patterns, variations in things that you can't put into words, you can't describe. But when you see it, you know it. That's why when you see somebody walking down the street and you recognize them as somebody you went to high school with 20 years before, you recognize them. Or you smell a smell that reminds you of your grandmother's house, or something like that.

"The mind is—you can never describe why you recognize that stuff. You just know that your mind does recognize that stuff; okay?

"The reason I bring all that up is because that happened multiple times in this case. You may not be aware of this, but I hope to bring your attention to it; all right?

"Defense counsel claims that you shouldn't believe Laura [I.], you shouldn't believe [Jonathan T.], you shouldn't believe William [G.] because their identities were different than what they said originally; okay? For instance, Laura [I.] originally described the gun as black that was pointed into her face. But when she was shown a picture of the gun, and she says, 'Yes, that's it.'

"Why? Well, either she's lying or she actually saw it. She recognized it.

"It's amazing what the human mind will recognize if you actually see it. You may have as your recollection a somewhat different recollection of what it is, but if you see it, you recognize it. That's a human phenomenon. It goes with being a human. Our minds work that way.

"Why is it that Jonathan [T.] could not pick out the defendant in a photo lineup, but yet when he saw him in court, he recognized him and identified him? Well, either, number one, he's lying or when he actually for the first time in all these years is in close proximity to the defendant and he's able to see the complete shape of his head, the complete shape of his body, the way he carries himself, the way he looks, the way he holds his head, the way his eyes focus on you, whatever it is about the way each individual person comports themselves, you recognize him.

35.

"This shouldn't come as a shock to you. This shouldn't come as a surprise to you. We do it all the time. We may not be aware that we do it, but we do it all the time.

"So when he's actually in court and he sees the defendant, he's able to say, 'That's him. That's him. That's the guy that hit me, was hitting me in the face with the gun. And that's the guy that put the gun to my head and pulled the trigger.'

"William [G.]. William [G.] described the truck as a white Dakota originally. But he described it as a white Dodge with a camper shell; all right?

"Now Defense counsel made the claim to you that he said that when he was shown the picture in our case that he said, 'I think it was a Dakota.'

"You will have to look back at the testimony yourself. But if I recall—and, again, this—you need to look back at the testimony yourself, but I believe he said, 'Yeah, that's possibly it.'

"Why? Again, because he's seen a picture of it, and it's comporting with a memory.'

"You see that's happened three times in this case. Three people have picked out things in court because they've actually seen those things or those people firsthand, not in pictures. I guess in William [G.]'s case, it was a picture, but, you know, for the first time in all these years. And because they've seen it, it triggers a memory, and they recognize it."

Valenzuela complains this experiment did not "accurately simulate the events at the scene." We reject this complaint. Although the record is undeveloped as to how exactly the experiment was conducted, it is clear the purpose of the experiment was not to establish some baseline standard of human recall that the jurors could use to evaluate witnesses' ability to recall certain things. Rather, the experiment was an illustration conducted for the permissible purpose of bringing to the jurors' minds a common phenomenon of memory recall. We therefore conclude this experiment was not improper. Besides, Valenzuela does not even attempt to explain how this experiment was prejudicial. Finding no prejudice, we cannot conclude Valenzuela's counsel was ineffective for failing to object. The claim is forfeited.

36.

### B.    Prosecution's theory of the Jacobo murder

Valenzuela complains that the prosecutor during closing argument asserted that Valenzuela "shot Jacobo from a distance, and he chased him all across the street.  And when Jacobo finally fell, he walked up on him and shot him a couple times in the head, apparently."  He says this theory was not supported by the evidence.  We disagree.

Prosecutors have wide latitude to discuss and draw inferences from the evidence duly presented at trial, and whether the inferences drawn by the prosecutor are reasonable are for the jury to decide. (*People v. Ervine* (2009) 47 Cal.4th 745, 806.)  A prosecutor engages in misconduct by misstating facts or referring to facts not in evidence, but enjoys wide latitude in commenting on the evidence, including urging the jury to make reasonable inferences and deductions. (*People v. Hamilton* (2009) 45 Cal.4th 863, 928.)  Here, the prosecutor's theory of Jacobo's murder was supported by the evidence.  The blood trail from the middle of the street to the sidewalk, the 30 seconds between the groups of shots, and that there were some bullet casings in the middle of the street and some near Jacobo's body supports the prosecutor's theory.

## IV.    Admission of testimony by Morales and Mariano's mothers

Valenzuela contends the court erred when it allowed the mothers of Morales and Mariano to testify.  In support he argues that he offered to stipulate to the testimony the prosecution intended to elicit, and that such an offer rendered the testimony itself irrelevant and inadmissible.

The prosecution called Morales and Mariano's mothers as witnesses back-to-back. The testimony from each was very short and neither was cross-examined.  With Mariano's mother, the prosecution showed her a picture and asked if she knew who it was. She said it was her son.  She also stated Mariano's birthdate and said she last saw him alive on November 30, 2012.  With Morales's mother, the prosecutor also began by showing her a picture of Morales and asking if she recognized who it was.  She said it was her son.  She gave Morales's birthdate and said she last saw him alive on

December 1, 2012.  She said she saw him driving a truck the night he was killed.  She also said she went to a parking lot to pick up his truck after he was killed.

Valenzuela characterizes the mothers' testimony as victim impact testimony, but we disagree because neither mother was asked what effect the crimes had on them or the victims' other relatives and friends.  The proper framing of the issue is that the victims' mothers offered irrelevant testimony that improperly inflamed the jurors' emotions.

The People contend the issue is forfeited because Valenzuela did not offer to stipulate to Morales and Mariano's identities.  Instead, they claim Valenzuela only asserted that the two victims' identities were not in dispute, which is not the same as making an offer to stipulate.  Valenzuela counters that an offer to stipulate would have been futile.  He notes that when his counsel told the court the victims' identities were not in dispute, the court said it could "not force one side to accept a stipulation and offer a stipulation."  We need not resolve whether the lack of a formal offer of proof forfeited the claim because any alleged error was harmless.

The California Supreme Court "ha[s] observed that the testimony of a parent to establish the identity of a murder victim may not be relevant if there is an offer to stipulate to the facts to be established by the testimony." (*People v. Wash* (1993) 6 Cal.4th 215, 247.)  However, there is no reasonable probability of prejudice here from any alleged error in allowing the mothers' testimony.  The prejudice threatened here is inflaming the jurors' emotions against the defendant. The identification testimony of the mothers was factual and brief and was not accompanied by any so-called "victim impact testimony."  There were also no emotional outbursts.  "Thus, the testimony 'had no potential to inflame the jurors and hence would not have resulted in prejudice.' " (*Wash,* at p. 247.)

## V.  In camera *Pitchess* review

Valenzuela requests this court independently review the sealed in camera record to determine whether the record is adequate for review and, if so, whether the trial court

38.

properly denied the discovery he sought in his motion under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*). The People do not object.

A. **Background**

On April 4, 2018, Valenzuela filed a *Pitchess* motion seeking disclosure of information concerning Detective Deliman and Officer Salyers. The motion sought to discover the personnel and administrative records of the two officers "concerning any complaints, from any and all sources, any and all complaints from any and all sources alleging acts involving dishonesty, use of excessive force, criminal conduct and/or moral turpitude …."

The motion cited a media report of allegations that Deliman embezzled money from the Merced Police Officers' Association, and also cited an investigative report telling of allegations that Officer Salyers engaged in an unethical relationship with a witness.

The City of Merced opposed the *Pitchess* motion. The trial court heard the motion and granted it in part. The trial court conducted an in camera review on May 8, 2018. A court reporter was present during the closed hearing. A custodian of records on behalf of the Merced Police Department was sworn and testified. The custodian stated it had searched for potentially responsive records pertaining to Valenzuela's *Pitchess* motion. The custodian brought Deliman's and Salyers's personnel files to court. The custodian stated there was nothing in Deliman's file involving dishonesty but noted that he was aware of the embezzlement allegations against Deliman.

As to Salyers, the custodian directed the court's attention to an incident involving dishonesty. The court reviewed documents from Salyers' files regarding the incident and identified 12 witnesses as potentially having information that could be used to impeach Salyers. Defense counsel was confidentially provided with contact information for these 12 witnesses, eight of whom were peace officers.

39.

On July 12, 2018, Valenzuela filed a supplemental *Pitchess* motion seeking an order "directing the Merced Police Department to provide verbatim reports encompassing the statements or roles of uncooperative or otherwise unavailable witnesses." Valenzuela withdrew the motion on July 26, 2018.

On October 24, 2018, during motions in limine, the prosecutor moved to exclude any question or reference to Salyers's alleged misconduct as unsubstantiated. Defense counsel stated he was not planning to cross-examine Salyers "on the complaint made by a female complainant" stating that he did "an inquiry" and could not "substantia[te]" any facts. The court granted the prosecutor's motion in limine.

## B. The standard of review

" 'A criminal defendant has a limited right to discovery of a peace officer's personnel records. [Citation.] Peace officer personnel records are confidential and can only be discovered pursuant to Evidence Code sections 1043 and 1045.' " (*People v. Yearwood* (2013) 213 Cal.App.4th 161, 180 (*Yearwood*).) "A defendant is entitled to discovery of relevant information from the confidential records upon a showing of good cause, which exists 'when the defendant shows both " 'materiality' to the subject matter of the pending litigation and a 'reasonable belief' that the agency has the type of information sought." ' " (*Ibid*.)

When the court finds good cause and conducts an in camera review pursuant to *Pitchess*, it must make a record that will permit future appellate review. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1229—1230.) A custodian need not present to the trial court any documents that are "clearly irrelevant" to the *Pitchess* motion. (*Id.* at p. 1229.) But if the custodian has any doubt, those documents should be presented to the trial court. (*Ibid*.) "The custodian should be prepared to state in chambers and for the record what other documents (or category of documents) not presented to the court were included in the complete personnel record, and why those were deemed irrelevant or otherwise

40.

nonresponsive to the defendant's *Pitchess* motion." (*Ibid*.) A court reporter should memorialize the custodian's statements and any questions asked by the trial court. (*Ibid*.)

### C. Analysis

We have reviewed the in camera proceeding. The trial court complied with the procedural requirements of a *Pitchess* hearing. A court reporter was present, and the custodian was sworn prior to testifying. (*Yearwood, supra,* 213 Cal.App.4th at p. 180.)

We have reviewed the sealed personnel files of Deliman and Salyers. Besides what the court ordered be disclosed, nothing else was subject to disclosure under *Pitchess*. Based on this record, the superior court properly conducted the *Pitchess* hearing. Accordingly, no error occurred when the court denied any disclosure.

## VI. Prior prison term enhancement

Valenzuela argues Senate Bill No. 136 (2019-2020 Reg. Sess.) (Stats. 2019, ch. 590, § 1) (SB 136) requires that his section 667.5, subdivision (b), one-year prior prison term enhancements applied to his sentence be stricken because his prior convictions were not for sexually violent offenses as defined in Welfare and Institutions Code section 6600, subdivision (b). The People agree, as do we.

On October 8, 2019, while this appeal was pending, the Governor signed SB 136, which amended Penal Code section 667.5, subdivision (b), effective January 1, 2020, to limit that subdivision's prior prison term enhancement only to prior prison terms for certain sexually violent offenses. (*People v. Lopez* (2019) 42 Cal.App.5th 337, 340—341.) The statute is retroactive and applies to cases where the judgment is not yet final as of its effective date, and therefore applies here. (*People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 303, 308; *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*).) Valenzuela is within the ambit of the amended statute because his prior prison term was served for a violation of section 273.5, subdivision (e), corporal injury on a spouse or cohabitant, which is not a sexually violent offense. His one-year prior prison term enhancement must be stricken.

41.

## VII. Assembly Bill No. 333

While this appeal was pending, the Legislature enacted Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 699, §§ 1-5) (AB 333), which amended, in part, the elements necessary to sustain a gang enhancement. (*People v. Ramos* (2022) 77 Cal.App.5th 1116, 1119 (*Ramos*).) AB 333 also added section 1109, which permits a defendant to request bifurcation of alleged gang enhancements, and it requires bifurcation of any charge that a defendant is actively participating in a criminal street gang. (§ 1109, subds. (a) & (b), added Stats. 2021, ch. 699, § 5.)

Valenzuela contends the jury's true findings on the section 186.22, subdivision (b), gang enhancements, which are attached to counts 1 and 2; on the section 12022.53, subdivision (d)—(e), enhancements attached to counts 1 and 2; and on the section 190.2, subdivision (a)(22) gang-murder special circumstance allegations in connection with counts 1 and 2 must be vacated because of AB 333's enactment. We conclude the section 186.22 and section 190.2 findings must be vacated, but not the section 12022.53 findings.

Valenzuela also contends that, under newly enacted section 1109, all of his convictions must be reversed, and he is entitled to a new trial in which all of the gang allegations—both the section 186.22 allegations and the section 190.2, subdivision (a)(22), special circumstances—are bifurcated. We disagree.

### A. The section 186.22 enhancements

Effective January 1, 2022, AB 333 significantly modified the requirements to prove a gang enhancement under section 186.22. (*People v. Sek* (2022) 74 Cal.App.5th 657, 663, 665 (*Sek*).) Valenzuela argues that the amendments apply retroactively to his case, and that, because the jury convicted him under the prior version of the law, the gang enhancements must be reversed. The People agree, as do we.

Section 186.22 provides for enhanced punishment when a person is convicted of an enumerated felony "committed for the benefit of, at the direction of, or in association

with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members." (§ 186.22, subd. (b)(1).)

Before AB 333 was enacted, the statute defined a " 'criminal street gang' " as "any ongoing organization, association, or group of three or more persons, … having as one of its primary activities the commission of one or more [enumerated criminal acts], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, former subd. (f); Stats. 2017, ch. 561, § 178.) To establish a "pattern of criminal gang activity," the prosecution needed to prove only that those associated with the gang committed two or more predicate offenses within a period of three years and that the offenses were committed on separate occasions, or by two or more persons on the same occasion. (*Menifee v. Superior Court* (2020) 57 Cal.App.5th 343, 362.) A predicate offense could be established by evidence of the charged offense, and, in most cases, it was unnecessary to prove that the predicate offenses were gang related. (*Ibid.*; *People v. Rodriguez* (2022) 75 Cal.App.5th 816, 822 (*Rodriguez*); *People v. Garcia* (2020) 46 Cal.App.5th 123, 165.)

AB 333 increased the evidentiary requirements to prove a gang-related enhancement in several respects. First, it narrowed the definition of " 'criminal street gang' " to "an ongoing, organized association or group of three or more persons … whose members collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f).) The statute now requires the prosecution to prove that two or more gang members committed each predicate offense. (*People v. E.H.* (2022) 75 Cal.App.5th 467, 477 (*E.H.*).)

Second, AB 333 created stricter requirements to prove "a pattern of criminal gang activity." Under the new legislation, (1) the last predicate offense must have occurred not only within three years of the prior predicate offense, but also within three years of the date of the currently charged offense; (2) the predicate offenses must have "*commonly*

benefited a criminal street gang," and that benefit must be "*more than reputational;*" and (3) the currently charged offense cannot be used as a predicate offense. (§ 186.22, subds. (e)(1)—(2), (g), italics added; *People v. Lopez* (2021) 73 Cal.App.5th 327, 345 (*Lopez*); *Rodriguez, supra,* 75 Cal.App.5th 822—823.)

The parties agree, as do we, that AB 333's changes apply retroactively to Valenzuela's case. Under *Estrada, supra,* 63 Cal.2d 740, absent evidence to the contrary, we presume that the Legislature intended such ameliorative changes to the criminal law to apply to all criminal cases not yet final on appeal. (*Id.* at pp. 744—746; *People v. Nasalga* (1996) 12 Cal.4th 784, 792; *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 301.) AB 333 is an ameliorative amendment that increases the threshold for imposition of a gang enhancement. (*Lopez, supra,* 73 Cal.App.5th at p. 345; accord, *People v. Vasquez* (2022) 74 Cal.App.5th 1021, 1032.) Because AB 333 is silent regarding retroactivity, under *Estrada*, we presume it applies retroactively to all nonfinal cases on appeal, including this one. (See, e.g., *Lopez*, at pp. 343—344; *Sek, supra,* 74 Cal.App.5th at p. 667.)

Here, it is indisputable the evidence presented at trial was insufficient to prove the gang enhancements under the new law. The People did not present evidence to prove the predicate offenses commonly benefited the gang in any manner, much less in a manner that was more than reputational. Also, there was no evidence any of the predicate offenses were committed by two or more gang members. The jury was also not prohibited from relying on the currently charged offenses to establish a predicate offense.

The jury was not asked to, and therefore did not make, the factual determinations now required to impose a gang enhancement under section 186.22. We therefore conclude the section 186.22, subdivision (b), enhancements must be vacated, and the matter remanded to give the People a chance to retry the gang enhancements under the amended law. (*E.H., supra,* 75 Cal.App.5th at p. 480; accord, *Lopez, supra,*

44.

73 Cal.App.5th at p. 346; *Sek, supra,* 74 Cal.App.5th at p. 669; *Rodriguez, supra,* 75 Cal.App.5th at p. 823, fn. 19.)

**B.      Section 12022.53 enhancements**

Valenzuela also contends the section 12022.53, subdivision (d)—(e), enhancement findings attached to counts 1 and 2 must be reversed because of AB 333.  We disagree.

"[S]ection 12022.53 establishes a tiered system of sentencing enhancements for specified felonies involving firearms."  (*People v. Tirado* (2022) 12 Cal.5th 688, 692 (*Tirado*).)  It "provides for escalating punishments depending on how the firearm is used."  (*Lopez, supra,* 73 Cal.App.5th at p. 347.)

"Section 12022.53[, subdivision] (b) mandates the imposition of a 10-year enhancement for personal *use* of a firearm in the commission of one of those felonies; section 12022.53[, subdivision] (c) mandates the imposition of a 20-year enhancement for personal and intentional *discharge* of a firearm; and section 12022.53[, subdivision] (d) provides for a 25-year[ ]-to life enhancement for personal and intentional discharge of a firearm *causing great bodily injury or death* to a person other than an accomplice."  (*Tirado, supra,* 12 Cal.5th at p. 695.)

"While these subdivisions provide punishment for offenders who personally use a firearm during the commission of their crimes, the penalties may also be imposed on any person who is a principal in the offense under certain gang-related circumstances[.]"  (*Lopez, supra,* 73 Cal.App.5th at p. 347.)  For the firearm enhancements to apply vicariously, the prosecution must plead and prove that the defendant violated section 186.22, subdivision (b), and that "[a]ny principal in the offense committed any act specified in [section 12022.53,] subdivision (b), (c), or (d)."  (§ 12022.53, subd. (e)(1)(A)-(B),  italics added; see also *People v. Anderson* (2020) 9 Cal.5th 946, 953; *Lopez, supra,* at p. 347.)

Obviously, AB 333's "changes to section 186.22 affect not only the gang enhancement allegations under that statute but other statutes that expressly incorporate

45.

provisions of section 186.22[,]" such as the vicarious liability firearm enhancement under section 12022.53, subdivision (e)(1). (*Lopez, supra,* 73 Cal.App.5th at p. 346; see also *People v. Lisea* (2013) 213 Cal.App.4th 408, 416 ["the section 12022.53[, subdivision] (e)(1) enhancement … incorporat[es] the criminal street gang finding of section 186.22, subdivision (b) as a required element"].)

Valenzuela's jury was given the following instruction:

"If you find the defendant guilty of the crimes charged in Counts 1 and 2, and you find that the defendant committed those crimes for the benefit of, at the direction of, or in association with a criminal street gang with the intent to promote, further, or assist in any criminal conduct by gang members, you must then decide whether, for each crime, the People have proved the additional allegation that one of the principals personally and intentionally discharged a firearm during that crime and caused death. You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime.

"To prove this allegation, the People must prove that:

"1.	Someone who was a principal in the crime personally discharged a firearm during the commission of the Murder;

"2.	That person intended to discharge the firearm;

"AND

"3.	That person's act caused the death of another person."

Thus, the jury was instructed only with the section 12022.53, subdivision (e), theory—the vicarious liability theory. The jury was not instructed with the section 12022.53, subdivision (d), theory—the theory that applies only to the one who discharges the firearm.

Despite that, the verdict forms for the section 12022.53 allegation in connection with counts 1 and 2 read as follows: "We the jury, further find that the defendant, Pete Valenzuela, Jr., intentionally and personally discharged a firearm, to wit: a 9 mm semi-automatic pistol, and proximately caused great bodily injury and death to a person (other

than an accomplice), within the meaning of Penal Code section 12022.53[, subdivisions] (d) & (e)."

The People contend that because the verdict forms did not track the language of subdivision (e) of section 186.22, and because the prosecutor argued that Valenzuela was the shooter in counts 1 and 2, "it does not appear" the jury relied on subdivision (e)'s vicarious liability theory. They contend there is no reasonable doubt the jury relied on the personal discharge theory, not the vicarious liability theory.

Valenzuela counters it "cannot be readily inferred" "that the jury did not make findings on the gang gun enhancements" because the jury was instructed with section 12022.53, subdivision (e), the vicarious liability theory. He also argues the prosecution cannot prove beyond a reasonable doubt that one or more jurors did not rely on the subdivision (e) vicarious liability theory to reach a true finding on the enhancements. He says this is because his trial counsel argued that Cervantes fabricated his testimony, that Nicholas B. testified he did not see Mariano and Morales fall down after the gunshots, that there was another group of people who arrived at Mariah R.'s apartment on December 1, 2012, and that "there was substantial evidence that Barajas was the person who possessed the gun used in the homicides." Valenzuela argues the jury could have inferred Valenzuela was not the shooter from this evidence.

We disagree with Valenzuela. We are confident beyond a reasonable doubt that the jury did not rely on section 12022.53, subdivision (e)(1)'s, vicarious liability theory— and reject the section 12022.53, subdivision (d), theory—in returning a true finding on the enhancement. This is because it is unreasonable to think that someone else other than Valenzuela shot Morales and Mariano. Multiple witnesses testified about Valenzuela's argument with Mariano and Morales, there was strong evidence Valenzuela had a motive to shoot the two victims, there was no evidence that anyone else besides Valenzuela and Cervantes were anywhere near Morales and Mariano at the time shots were fired, and there was no evidence Barajas was in the area at the time. We find it implausible the jury

47.

found the section 12022.53 gun enhancement true as to counts 1 and 2 on the theory that someone else shot Morales and Mariano. The section 12022.53 enhancements as to counts 1 and 2 need not be reversed.

**C.    The section 190.2, subdivision (a)(22), special circumstance**

Valenzuela and the People disagree about whether AB 333's amendments apply to the gang-murder special circumstance findings (§ 190.2, subd. (a)(22)). Valenzuela contends they do; the People say they do not. We conclude the amendments apply to the section 190.2, subdivision (a)(22) findings and reverse those findings.

There is a split of authority on this issue. "In *People v. Lopez* [(2021)] 73 Cal.App.5th 327, […] the Second Appellate District, Division Eight, concluded 'Assembly Bill 333's changes to section 186.22 affect not only the gang enhancement allegations under that statute but other statutes that expressly incorporate provisions of section 186.22,' including section 190.2[, subdivision] (a)(22). (*Lopez,* at p. 346[…].) Section 190.2[, subdivision] (a)(22) was enacted as part of Proposition 21, an initiative measure approved by the electorate in the March 2000 primary election. (*People v. Shabazz* (2006) 38 Cal.4th 55, 64—65, […].) Section 190.2[, subdivision] (a)(22) makes first degree murder a capital crime if '[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, *as defined in subdivision (f) of Section 186.22*, and the murder was carried out to further the activities of the criminal street gang.' " (*People v. Lopez* (2022) 82 Cal.App.5th 1, 10.)

"The Second Appellate District's *Lopez* opinion holds that because 'the definition of a criminal street gang has been narrowed by Assembly Bill 333 and new elements added in order to prove a criminal street gang and a pattern of criminal activity,' the requirements for proving a gang special circumstance under section 190.2[, subdivision] (a)(22) have likewise changed. (*People v. Lopez, supra,* 73 Cal.App.5th at p. 347[…].) In *People v. Rojas* (2022) 80 Cal.App.5th 542 […] (*Rojas*), a divided panel in our district reached the opposite conclusion. The *Rojas* majority held that '[b]ecause

Assembly Bill 333 "takes away" from the scope of conduct that Proposition 21 made punishable under section 190.2' (*id.* at p. 555[…]), 'it is unconstitutional to the extent it would amend that initiative' (*id.* at p. 557[…])." (*People v. Lopez, supra,* 82 Cal.App.5th at p. 10.)

"The *Rojas* majority relied on the fact that California voters restricted the Legislature's ability to amend the provisions of Proposition 21. The majority's reasoning was as follows: 'While the Legislature was free to amend Proposition 21 …, it could only do so with a two-thirds vote in each house. (Voter Information Guide, Primary Elec. (Mar. 7, 2000) text of Prop. 21, ... § 39, p. 131.) Assembly Bill 333 did not comply with that requirement and therefore cannot amend Proposition 21.' (*Rojas, supra,* 80 Cal.App.5th at p. 555[…].) In practical effect, *Rojas* holds that a special circumstance murder allegation under section 190.2[, subdivision] (a)(22) may be proven based on a different, less restrictive definition of a 'criminal street gang' than is found in the current version of section 186.22. (See *Rojas,* p. 558[…] [holding 'Assembly Bill 333 does not alter the scope or effect of section 190.2, subdivision (a)(22)'].)" (*People v. Lopez, supra,* 82 Cal.App.5th at p. 10.)

"In *People v. Lee* (2022) ___ Cal.App.5th ___[..][(*Lee*)], Division Four of the Second District concluded Assembly Bill 333 does not unconstitutionally amend section 190.2[, subdivision] (a)(22). Focusing on the question of voter intent, the *Lee* court opined there is 'nothing to suggest that the electorate intended to impose a time-specific incorporation of the term " 'criminal street gang' " in the gang-murder special circumstance statute.' (*Id.* at p. ___[…].) Accordingly, *Lee* holds 'that the term " 'criminal street gang' " as incorporated in the gang-murder special-circumstance statute was "intended to conform at all times" and "remain permanently parallel" to section 186.22.' " (*Ibid.*, quoting *In re Jovan B.* (1993) 6 Cal.4th 801, 816 & fn. 10[…].)" (*People v. Lopez, supra,* 82 Cal.App.5th at p. 11.)

The People urge us to adopt the *Rojas* court's view, while Valenzuela urges us to follow the reasoning in *Lee*. We agree with and endorse the *Lee* holding. Applying that holding here, the section 190.2, subdivision (a)(22), special circumstance findings must be reversed.

### D.    Section 1109

AB 333 added section 1109, which requires gang enhancements charged under section 186.22, subdivision (b) or (d) to be tried separately from the underlying charges upon request from the defense. (Stats. 2021, ch. 699, § 5.) Section 1109 also requires the substantive offense of active participation in a criminal street gang (§ 186.22, subd. (a)) to be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime.

Valenzuela contends section 1109 applies retroactively, and further contends the failure to bifurcate the gang enhancement from the trial on the underlying charges is structural error requiring automatic reversal. This court recently held in *Ramos, supra,* 77 Cal.App.5th 1116, that section 1109 applies retroactively to cases not yet final on appeal. (*Ramos*, at p. 1119.) *Ramos* also held the failure to bifurcate the gang enhancement from the trial on the underlying charges is reviewed for prejudice under the *Watson* standard (*People v. Watson* (1956) 46 Cal.2d 818, 836); that is, reversal is required only if "it is reasonably probable [Valenzuela] would have obtained a more favorable verdict in the absence of the gang evidence that would not have been presented had the gang enhancement been bifurcated." (*Ramos,* at p. 1131.)

We see no reason to deviate from *Ramos*'s holding, and thus conclude section 1109 applies retroactively to this case. That said, Valenzuela was not prejudiced by the failure to bifurcate the gang enhancement because all of the gang evidence presented at trial was admissible to prove the section 190.2, subdivision (a)(22) allegation. As the court in *People v. Montano* (2022) 80 Cal.App.5th 82 explained, prejudice for failure to bifurcate a section 186.22, subdivision (b), enhancement under

50.

1109 "cannot be shown if all the gang evidence would have been admitted due to the allegation of a gang murder for purposes of section 190.2[, subdivision] (a)(22)." (*Ibid.* at pp. 108—109.) Thus, section 1109's retroactive application to this case does not require a reversal of all underlying counts.

## VIII. Senate Bill No. 567

Valenzuela contends remand is required "to ensure compliance with Senate Bill 567." The Governor signed Senate Bill No. 567 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 731, § 1.3) (SB 567) into law, effective January 1, 2022, while this appeal was pending. SB 567, among other things, generally limits the trial court's ability to impose the upper term unless aggravating circumstances have been stipulated to by the defendant or found true beyond a reasonable doubt by a jury or by the court in a court trial. (§ 1170, subd. (b)(1), (2), added by Stats. 2021, ch. 731, § 1.3.) Evidence of the defendant's prior convictions, in the form of certified records of conviction, is an exception to this general rule and need not be submitted to a jury. (§ 1170, subd. (b)(3), added by Stats. 2021, ch. 731, § 1.3.) "These amendments apply retroactively to [Valenzuela] because his conviction was not final when this legislation took effect." (*People v. Flores* (2022) 75 Cal.App.5th 495, 500.)

The trial court imposed but stayed a term of 10 years on count 5 (assault with a semiautomatic firearm against Jonathan T.), consisting of the upper term of nine years plus one year for the prior prison term enhancement. (§ 245, subd. (b) [sentencing triad for assault with a semiautomatic firearm is three, six, or nine years].) Since we are already remanding on other grounds, we need not address Valenzuela's argument that SB 567 would require a remand for resentencing on its own. All we need to say is that on remand, the trial court must apply section 1170 as amended when resentencing Valenzuela.

## IX. Fines, fees, and assessments

Lastly, Valenzuela argues the imposition of his restitution fine, his criminal conviction assessment, and his court security fee violated his right to due process under the United States and California Constitutions. Since he will be receiving a full resentencing, the issue of his ability to pay his fines, fees, and assessments is moot. (*People v. Canedos* (2022) 77 Cal.App.5th 469, 481 (*Canedos*).) He can raise his inability to pay at his resentencing.

## DISPOSITION

The section 186.22, subdivision (b), enhancement findings and the section 190.2, subdivision (a)(22), special circumstance findings are reversed. The prosecution may elect to retry those allegations. Whether or not the prosecution elects to retry, Valenzuela is entitled to a full resentencing on remand, where the trial court will have jurisdiction to revisit all of its sentencing choices. (*People v. Canedos* (2022) 77 Cal.App.5th 469, 481.) In all other respects, the judgment is affirmed.


SNAUFFER, J.

WE CONCUR:


SMITH, ACTING P. J.


MEEHAN, J.

52.